## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### IN ADMIRALTY

### Case No. 08-21213-CIV-MORENO/TORRES

PANAMA SHIPPING LINES, INC.,

        Plaintiff,

v.

CIRAMAR INTERNATIONAL TRADING,
LTD., CIRAMAR, S.A., NAVIERAS DEL
CARIBE A/K/A "NADELCA,"

        Defendants

_____/

## ORDER DENYING
## <u>VERIFIED MOTION FOR ATTORNEYS' FEES</u>

      This matter is before the Court upon Defendant Naviera Del Caribe's ("Nadelca's") Verified Motion for Attorneys' Fees [D.E. 50], filed August 6, 2008, and Plaintiff Panama Shipping Lines, Inc.'s ("Panama's") Response [D.E. 52], filed August 21, 2008. After careful consideration of the motion, response, reply, relevant authority, and the record in the case, Defendant Nadelca's Verified Motion for Attorneys' Fees is Denied.[1]

---

[1]    The motion does not seek dispositive relief per se, but an order awarding fees enforced through a judgment would clearly be dispositive. The pending motion is thus being adjudicated by Order for administrative reasons, but the entry of this Order does not preclude Nadelca from seeking *de novo* review from the District Judge if it has timely objections to this Order, in which case the Order shall be treated as a Report and Recommendation under S.D. Fla. Local Mag.J. R. 4 and 28 U.S.C. § 636.

## I.  BACKGROUND

This suit in admiralty was filed by Plaintiff Panama, a Panamanian shipping company with an office in Miami, on April 25, 2008, against Ciramar International Trading, Ltd. ("Ciramar, Ltd.") and Nadelca, alleged providers of vessel repair and other maritime services.   The Verified Complaint [D.E.1] asserted a claim of negligence against Defendants in repairing Panama's commercial vessel, the *M/V Tideway*, thus causing a severe hull leak that culminated in the sinking and total loss of the ship on May 16, 2006.

After retaining counsel and attempting to contact Ciramar, Ltd. (which efforts proved unsuccessful), Panama initiated suit, seeking $1 Million in damages.   As no formal contract for the services provided was ever formed between the parties, Panama looked to the invoices it received for the repairs to determine exactly who the proper defendants would be.   Though Panama determined that Ciramar, Ltd. was generally responsible for the repair work, whereas Nadelca was generally responsible for providing ship agency services, Panama identified an entry on the Nadelca invoice which seemed to suggest that Nadelca had some hand in the repairs as well.[2]

---

[2]    The pertinent entry appeared as follows:
   **Purchase Of**: 300 feet of cable to weld to USD$2.95 per feet... $885.00
   **Paint**:  40 Gls. Sigma Epoxy Gray (USD 28.00 per gls)...     $1,120.00
            10 Gls. Thinner International (USD 21.00 per gls)...     $210.00
*See* Verified Motion for Attorney's Fees [D.E. 50-A].

After some subsequent research that seemed, from Panama's perspective, to support the theory that Nadelco was wholly-owned by Ciramar, and in light of Panama's conclusion that the sinking was caused by faulty welds,[3] Panama determined that Nadelca was a proper defendant and named it in the suit on April 25, 2008.

Because the Defendants could not be located in the United States,[4] they could not be served with summons and complaint as provided for by Rule 4 of the Federal Rules of Civil Procedure.  In order to assure vindication of its rights, Panama sought to preserve whatever funds Defendants might be holding in the United States and attach and seize them to guarantee their claims.  Two accounts at Ocean Bank were subsequently seized on May 6, 2008: one belonging to Nadelca, holding approximately $512,000; and the other belonging to Ciramar, S.A. (a previously unknown party), holding nearly $2.4 Million.

On May 16, 2008, Nadelca filed its Motion to Dismiss the Verified Complaint and Vacate Attachment [D.E. 11], which had attached an affidavit from Nadelca's principal, German Jimenez, attesting to the fact that Nadelca

---

[3]     Response to Verified Motion for Attorneys' Fees at 4 [D.E. 52].

[4]     All Defendants are located in the Dominican Republic.  That fact contributed to the District Judge's recent Order Dismissing Plaintiff's complaint based on lack of personal jurisdiction and/or under the doctrine of *forum non conveniens*.  [D.E. 61].  That Order of dismissal, however, reserved jurisdiction for the adjudication of the pending motion for fees filed by Nadelca.

is neither a wholly-owned entity of Ciramar, Ltd. nor a business which provides repair services.

Upon learning that the assets of Ciramar, S.A. (and not Ciramar, Ltd.) were seized, Panama hired counsel in the Dominican Republic to determine the nexus between the two Ciramar entities.   In light of the Jimenez affidavit, Panama also asked this counsel to locate additional information on Nadelca.   After determining that it had a strong alter-ego claim against Ciramar, S.A., Panama amended its complaint on June 5, 2008, to include this new entity. [D.E. 17].   It then voluntarily dismissed its claims against Nadelca one day later [D.E. 22], purportedly because the Garnishee had seized more than enough to cover the claimed damages from Ciramar, S.A., and Panama saw no need to expend additional attorneys' fees answering to a non-essential defendant.   The Court issued its Final Order of Dismissal as to Nadelca on July 19, 2008 [D.E. 41].

Nadelca now seeks an award of attorneys' fees claiming that Panama's representative, Mr. Salomon Btesh, made statements[5] that he knew or should have known not to be true and that caused Nadelca to expend considerable sums in defense.  Nadelca claims entitlement to attorneys' fees through Local Admiralty Rule B(5)(b) and/or Panama's alleged bad faith,

---

[5]     Specifically, Panama alleged that "[o]n information and belief [that] . . . Nadelca is a wholly owned business unit of Ciramar [and that Nadelca is] in the business of repairing vessels and providing other maritime services." Verified Complaint at ¶4 [D.E. 1].

malice, or wanton disregard for the rights of Nadelca.  We will address both arguments in turn.

## II.   ANALYSIS

### A.   _Local Admiralty Rule B(5)(b)_

Nadelca claims that it "is entitled to an award of attorneys' fees from Panama Shipping under [] Local Admiralty Rule B(5)(b)[6] which provides for such an award where, as here, an attachment or seizure in admiralty is vacated.  Motion at 4 [D.E. 50].  Nadelca argues that under the plain terms of this Local Rule it is entitled to attorneys' fees because it is undisputed that the attachment of the funds in the local bank account was conducted pursuant to Rule B and thereafter vacated by Court Order.  The express terms of the Rule have thus been satisfied.

In its Response, Panama argues that "[n]o Statute, no Federal Rule of Civil Procedure, and no Supplemental Admiralty Rule provides for the award of attorneys' fees in such situations.  As such, the quoted portion of Local Admiralty Rule B(5)(b) is inconsistent with those Federal Statutes and Rules.  Fed. R. Civ. P. 83(a)(1) prohibits and renders invalid Local Rules that are inconsistent with the Federal Statutes and Rules."[7]  Response to Verified

---

[6]    Local Admiralty Rule B(5)(b) states, in pertinent part: "If the Court orders that the seizure be vacated, the judicial officer shall also award attorney's fees, costs and other expenses incurred by the party as a result of the seizure."  S.D. Fla. Local R. B(5)(b).

[7]    Federal Rule of Civil Procedure 83(a)(1) states, in pertinent part: "After giving public notice and an opportunity for comment, a district court,

Motion for Attorneys' Fees at 8 [D.E. 52] (citing *Markham v. F/V Borland Drive,* 741 F. Supp. 188, 191 (D. Alaska 1989)).  In support of its opposition, Panama relies primarily on *Ashland Chem., Inc. v. Barco, Inc.*, 123 F.3d 261 (5th Cir. 1997), in which the Fifth Circuit invalidated a local rule because it contained a fee-shifting provision that was "substantive in nature and therefore require[d] congressional approval." *Id.* at 265.

*Ashland* involved a challenge to a local rule that required an offeree to pay the offeror's costs of litigation if the offeree rejected an offer of judgment and if a final judgment in the case was of more benefit to the offeror by 10%. *Id.* at 261.  The Movant in *Ashland* relied heavily on *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240 (1975), a Supreme Court case that invalidated a lower court's award of attorneys' fees to an environmental group attempting to bar construction of an oil pipeline. *Id.* at 241.  *Alyeska* affirmed that "it would be inappropriate for the Judiciary, without legislative guidance, to reallocate the burdens of litigation in the manner and to the extent urged by respondents . . . ." *Id.* at 247.

The Respondents in *Ashland* argued that they were entitled to attorneys' fees via the more recent decision in *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), where the Supreme Court affirmed a district court order requiring that the defendant pay the plaintiffs' attorneys' fees. *Id.* at 40.

---

acting by a majority of its district judges, may adopt and amend rules governing its practice.  A local rule must be consistent with - but not duplicate - federal statutes and rules adopted under 28 U.S.C. §§ 2071 and 2075 . . . ."

*Chambers* determined that "when sanctions under applicable rules and statutes are inadequate, a court may call upon its inherent powers to 'assess attorneys' fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.' " *Ashland*, 123 F.3d at 264 (quoting *Chambers*, 501 U.S. at 45-46 (internal citations omitted)).  The Supreme Court in *Chambers*, distinguishing *Alyeska*, explained: "[t]he limitation on a court's inherent power described [in footnote 31 of *Alyeska*] applies only to fee-shifting rules that embody a substantive policy, such as a statute which permits a prevailing party in certain classes of litigation to recover fees." *Id.* (quoting *Chambers*, 501 U.S. at 52).

Consequently, the Fifth Circuit in *Ashland* construed these two precedents as standing for the proposition that "substantive departures from the American rule[8] and its traditional exceptions must be authorized by Congress." *Id.* (citations omitted).  It further explained that "*Chambers* did not eviscerate the core holding of *Alyeska* that congressional authorization is necessary for novel departures from the American rule; rather it merely served to clarify that, despite *Alyeska*, courts retained their traditional, inherent power to sanction bad-faith conduct through the assessment of costs and attorneys' fees." *Id.*

---

[8] The American Rule stands for the proposition that "the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Alyeska*, 421 U.S. at 247.

The Eleventh Circuit has yet to directly address a challenge to a particular local rule like the one at issue here, and so the interpretation by other Courts of Appeal addressing substantively similar issues provides persuasive guidance. *See Sokol Bros. Furniture Co. v. Commissioner,* 185 F.2d 222, 224 (5th Cir. 1951) ("the decision of another Court of Appeals upon an issue and principle the same is properly entitled to great weight, and itself affords persuasive argument in the determination of the present case").

We point out, however, that the Eleventh Circuit recognizes the same general principle that federal court local rules are not boundless.  They are promulgated under the authority of 28 U.S.C. § 2071(a), which states:

> The Supreme Court and all courts established by Act of Congress may from time to time prescribe rules for the conduct of their business. *Such rules shall be consistent with Acts of Congress and rules of practice and procedure prescribed under [§ 2072].*

*See Jackson v. Crosby,* 373 F.3d 1291, 1296 (11th Cir. 2004) (quoting § 2071(a) with emphasis).  Section 2072(b) expressly limits the reach of a court's local rules to rules of practice and procedure:  "Such rules shall not abridge, enlarge or modify any substantive right."

Local rules are also subject to Fed. R. Civ. P. 83(a) that provides that a "local rule shall be consistent with – but not duplicative of – Acts of Congress and rules adopted under 28 U.S.C. § 2072 . . . ."  *Id.*  Thus, when a local rule conflicts with the Federal Rules of Criminal or Civil Procedure, the local rule is rendered invalid.  *Id.* at 1296-97 (holding that local rule that extended time period for filing motion to amend judgment in criminal action was contrary to

Fed. R. Crim. P. 6); *see also United States v. One Piece of Real Property,* 363 F.3d 1099, 1103 (11th Cir. 2004) (local rule regarding default by absence of response to motion, which conflicted with Fed. R. Civ. P. 56's requirement that district court independently review the record to enter judgment, was rendered void).

Indeed, the Supreme Court has often reaffirmed the principle that local rules are invalid if they conflict with an Act of Congress, if they conflict with the rules of procedure promulgated by the Court, if they are constitutionally infirm, if the subject matter governed by the rule is not within the power of a lower federal court to regulate, or if they otherwise conflict with "principles of right and justice." *Frazier v. Heebe,* 482 U.S. 641, 645, 654-55 (1987) (in part from Rehnquist, J., dissenting citing *Colgrove v. Battin,* 413 U.S. 149, 159-160, 162-164 (1973); *Miner v. Atlass,* 363 U.S. 641, 651-652 (1960); *Story v. Livingston,* 13 Pet. 359, 368, 10 L.Ed. 200 (1839)).

Accordingly it is undeniable that a court's local rules cannot create substantive rights to recovery of attorneys' fees.  The Supreme Court's decisions touching upon these issues make that crystal clear.  *Alyeska* expressly prohibits local substantive fee-shifting rules, and *Chambers* only allows for the imposition of fees as procedural sanctions.  *See also United States v. Mink,* 476 F.3d 558, 563-64 (8th Cir. 2007) (local rule, which authorized court to award specific type of costs against defendant in criminal action beyond those costs allowable by statute, was invalid); *Stern v. United*

*States Dist. Court for Dist. of Mass.,* 214 F.3d 4, 13 (1st Cir. 2000) ("Regardless of the source, local rulemaking authority is bounded.  A local rule must be both constitutional and rational, and its subject matter must be within the ambit of the court's regulatory power.").

We are left then to determine, as the Fifth Circuit did in *Ashland,* "whether the Local Rule is procedural, like sanctions for bad-faith conduct, or substantive."  123 F.3d at 264.  "Whether a rule that allows for fee shifting is procedural or substantive depends on the purposes and policies behind the rule itself."  *Id.* (citing *Hanna v. Plumer*, 380 U.S. 460, 471 (1965)).  "[T]he question is not whether [something] is deemed a matter of 'procedure' in some sense.  The question is . . . does it significantly affect the result of litigation for a federal court to disregard a law of a State that would be controlling in an action upon the same claim by the same parties in a State court?"  *Id.* at 265 (citing *Hanna*, 380 U.S. at 466).

Rejecting the Respondents' contention that "the Local Rule [at issue in this case] is procedural in nature because it will not affect parties' choice of forum [but rather] will simply serve to regulate their behavior before the court," the court in *Ashland* held that "[a]pplication of the Local Rule [in this case], unlike the imposition of bad-faith sanctions in *Chambers*, is tied to the outcome of the case. . . . [A] fee shifting provision 'which permits a prevailing party . . . to recover fees' embodies a substantive policy. . . . and therefore requires congressional approval."  *Id.* (citing *Chambers*, 501 U.S. at 52).

Eleventh Circuit precedent supports that conclusion, based upon its disposition of a similar question in a different context. In *McMahan v. Toto,* 256 F.3d 1120 (11th Cir. 2001), the Court considered this issue in the context of a choice of law analysis in a diversity case governed by the *Erie* doctrine, *Erie R.R. Co. v. Tompkins,* 304 U.S. 64 (1938). The Court had to decide whether Florida's "loser pays" attorney fee statute, Fla. Stat. § 768.79, was substantive or procedural. Following the analysis relied upon by the Supreme Court in A*lyeska,* the Court squarely held that statutes allowing for recovery of attorney's fees were indeed substantive for *Erie* purposes. *McMahan,* 256 F.3d at 1132-33 (citing *Alyeska,* 421 U.S. at 259 n.31 ("In an ordinary diversity case where the state law does not run counter to a valid federal statute or rule of court, state law denying the right to attorney's fees or giving a right thereto, which reflects a substantial policy of the state, should be followed."; *All Underwriters v. Weisberg,* 222 F.3d 1309, 1311-12 (11th Cir. 2000) (holding Florida statute allowing an insured or named beneficiary under an insurance policy to recover attorney fees upon judgment in insured's favor was substantive for *Erie* purposes)).

Applying that same analysis here, there can be little doubt that Local Admiralty Rule B(5)(b), as interpreted by Nadelca, serves as a fee-shifting provision that permits the prevailing party on a post-seizure motion to vacate to recover its attorneys' fees. It would require the Court to award attorneys' fees, regardless of the existence of any bad faith conduct. This interpretation

of the Local Rule clearly contemplates a substantive right that arises strictly from operation of the Rule.

If that interpretation were possible, one would also have to conclude, as Nadelca has argued here, that it would have to be deemed the "prevailing party" on its motion to vacate the seizure, notwithstanding the voluntary dismissal of all claims against Nadelca.  An Order vacating the seizure was entered, which clearly altered the legal relationship of the parties, thereby triggering prevailing party status. *See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dept. of Health and Human Res.*, 532 U.S. 598, 604-05 (2001); *see also Gibson v. Walgreen Co.*, No. 6:07-cv-1053-Orl-28KRS, 2008 WL 2607775, at *3 (M.D. Fla. July 1, 2008) (holding that a finding of prevailing party status requires a "judicial imprimatur to the dismissal") (citations omitted); *Johnson v. Pringle Dev. Inc.*, No. 5:05-cv-37-Oc-10GRJ, 2006 WL 2189542, at *2 (M.D. Fla. Aug. 1, 2006) ("[T]he Eleventh Circuit articulated a two-prong test for determining whether a litigant is a prevailing party, finding that 'there must be (1) a situation where a party has been awarded by the court at least some relief on the merits of his claim or (2) a judicial imprimatur on the change in the legal relationship between the parties.") (quoting *Smalbein v.City of Daytona Beach*, 353 F.3d 901, 905 (11th Cir. 2003)).

It follows, however, that such a change in the legal relationship of the parties, triggering an award of attorneys' fees solely under Local Admiralty Rule B(5)(b), would constitute a substantive fee-shifting provision.   In as far

as the rule permitted such a drastic reallocation of rights absent a showing of procedural bad faith, it would be substantive in nature and would then have to be deemed invalid absent Congressional assent.

We disagree ultimately, however, with Nadelca's interpretation of the Court's Local Admiralty Rule B(5)(b) (as well as the related Rule C(7) for *In Rem* Proceedings). District Courts have considerable discretion in applying their own local rules. *See, e.g., Vittoria N.A., LLC. v. Euro-Asia Imports, Inc.,* 278 F.3d 1076, 1081 (10th Cir. 2001); *Whitfield v. Scully,* 241 F.3d 264, 270-71 (2nd Cir. 2001). That leeway is especially important when necessary to avoid conflicts with federal laws or rules promulgated by Congress. *See, e.g., Marshall v. Gates,* 44 F.3d 722, 725 (9th Cir. 1995).

A plausible and more reasonable reading of the rule is that the drafters were simply reinforcing pre-existing admiralty law principles by inserting this attorneys' fees provision in the Local Rule. As a general rule, federal maritime common law traditionally allows for the award of attorneys' fees in wrongful seizure cases if the defendant can demonstrate that the plaintiff acted "in bad faith, with malice, or with wanton disregard for the rights of his opponent" in initiating suit. *Vestoil, Ltd. v. M/V M Pioneer*, No. 6:04CV770-ORL-19DAB, 2005 WL 3675960, at *5 (M.D. Fla. Mar. 31, 2005) (quoting *Cardinal Shipping Corp. v. M/S Seisho Maru*, 744 F.2d 461, 474 (5th Cir. 1984)); *see also Furness Withy (Chartering), Inc., Pan. v. World*

*Energy Sys. Assocs., Inc.* 854 F.2d 410, 411-12 (11th Cir. 1988) (citations omitted).

It is likely that the Rule was providing the parties with express notice of the possible application of this principle in the event that a seizure order was later vacated. That knowledge would, of course, provide the parties with notice of the issue in order to seek application of that rule, while at the same time preserving the Court's discretion to then apply well established admiralty principles based upon the facts presented in a given situation. The Rule, therefore, does not per se require that a Court impose an attorneys' fee award without a substantive analysis of traditional admiralty law to determine if fees should in fact be assessed.

Based upon that understanding of Local Rule B(5)(b), we turn to the substantive argument raised by Nadelca's motion as to why fees should be awarded in this case.

**B.** **_Bad Faith, Malice, or Wanton Disregard in Initiating Suit_**

Nadelca claims that it is entitled to an award of attorneys' fees "based on the uncontradicted evidence in the record of Plaintiff's bad faith, malice, or wanton disregard for the rights of Nadelca." Verified Motion for Attorneys Fees at 4 [D.E. 50]. Nadelca specifically argues that "[t]he Verified Amended Complaint and subsequent submissions by Panama Shipping contain allegations and exhibits [that] demonstrate that Panama Shipping was well aware and/or had the easy ability to make itself aware of the business status

of Nadelca, including: (1) that Nadelca has not performed any repairs on the vessel, and (2) that Nadelca is not a 'wholly-owned business entity of Ciramar' International." *Id.* at 3 [D.E. 50].

Panama denies these allegations, arguing that it had a good faith basis for including Nadelca as a party to the suit and that it has "acted honorably in all respects."   Response to Verified Motion for Attorneys' Fees at 9-13 [D.E. 52].

### 1.   *Panama's Belief as to Nadelca's Role in Repairs*

In support of the first claim, Nadelca contends that the title ("Agency Invoice") and substance of the invoice it issued to Panama "demonstrate that the services provided and invoiced here were the ship's agent services only, not repairs."   Verified Motion for Attorneys Fees at 3 [D.E. 50].   This statement is not completely accurate.   Contrary to Nadelca's interpretation, agency services *were not* the only services charged on the invoice.   As was noted above, *supra* note 2, the invoice contained charges for "cables to weld" and for paint.   It is reasonable to construe such an invoice for the purchase of cables to weld, or for paint, as being something other than just an invoice for an agency   service.   The invoice provided some evidentiary support for Panama's belief that Nadelca participated in the repairs.

As a corollary point, this Court finds Nadelca's implication that Panama attempted to deceive this Court by attaching an illegible copy of the invoice to their complaint unfounded.   As Counsel for Panama has pointed

out, the exhibit was attached to their Amended Verified Complaint [D.E. 17]. Taking into consideration the fact that Panama filed a Notice of Voluntary Dismissal [D.E. 22] as to Nadelca the very next day, it would be illogical - as Panama has pointed out - that Panama "would attempt to mislead the Court about a matter concerning a party that it had already agreed to dismiss from the lawsuit."  Response to Verified Motion for Attorneys' Fees at 12 [D.E. 52].

### 2.    *Panama's Belief as to Nadelca's Ownership*

In support of the second claim, Nadelca contends that an affidavit of Linnette Garcia (an attorney for Panama in the Dominican Republic) in which Ms. Garcia reports that Nadelca is not a wholly-owned business entity of Ciramar, Ltd., offers proof that Panama "knew all along" that it was suing an improper Defendant.  Verified Motion for Attorneys Fees at 4 [D.E. 50].

But again, this argument makes little logical sense.  Ms. Garcia was retained only *after* the Defendants had moved to vacate the seizure.  She was primarily retained to investigate the nexus between Ciramar, S.A. and Ciramar, Ltd. but, in light of Nadelca's claim that it was independent of Ciramar, Ltd., was asked to investigate Nadelca as well.  Though she did come to the conclusions Counsel for Nadelca has referred to, Panama did not receive that information until well after the suit began.  The Garcia affidavit, therefore, does not demonstrate that Panama "knew all along" that Nadelca was independent of Ciramar, Ltd.

Of course, this does not dispose of Panama's obligation to conduct preliminary research assuring that they have called the proper Defendants. Nadelca argues as much: "[W]ith a simple inquiry readily available to it that would demonstrate that Nadelca was not wholly-owned by Ciramar [Ltd.], Panama Shipping could have discovered the truth . . . ." Verified Motion for Attorneys Fees at 4 [D.E. 50]. Nadelca's point is well taken. However, Nadelca ignores the "inquiries" Panama *did* make so as to avoid improper action. Panama points to three specific pieces of evidence that supported its "information and belief" that Nadelca was a wholly-owned entity of Ciramar, Ltd. Response to Verified Motion for Attorneys' Fees at 9-10 [D.E. 52]. We will examine each in turn.

### (a) The Faxed Invoices

First, Panama argues that the invoices it received indicated that Ciramar, Ltd. in fact owned Nadelca. On March 18, 2008, Panama received a ten-page fax from Ciramar, Ltd. that contained invoices from both Ciramar, Ltd. and Nadelca. While the invoices are distinguishable in that different company logos appear at the top of the respective invoices, Ciramar Ltd.'s cover letter reads, in pertinent part, "[w]e sent to you the DD *and agency invoices* for the *services* given to Your Vessel Tide Way. . . . Thank you for choosing us as your shipyard and agency to offer our *services* to your vessel." Response to Verified Motion for Attorneys' Fees at 9-10 [D.E. 52-1] (emphasis added). Panama contends that "[t]he use of the words 'us' and 'our' can only

lead one to the conclusion that Ciramar, Ltd. and Nadelca were one in the same." Response to Verified Motion for Attorneys' Fees at 9-10 [D.E. 52]. While we reject Panama's reasoning in this respect - as a corporation acting alone would naturally use plural pronouns when referring to itself[9] - we find Panama's reliance on the invoices for the proposition that Nadelca was wholly owned by Ciramar, Ltd. nonetheless justified.

As indicated above, the notation on the cover letter - which was clearly sent by Ciramar, Ltd. - made specific references to "agency invoices" that "[w]e sent to you." Since the only agency invoices received by Panama were attached to this cover letter, and since Nadelca's company logo was affixed to these agency invoices, the most logical conclusion to be drawn was that Nadelca was a fully owned subsidiary of Ciramar, Ltd. Furthermore, the cover letter thanked Panama for accepting "our services." Since two separate "services" were provided (i.e., repair and agency), Panama had some factual basis to believe that Ciramar, Ltd. was claiming responsibility for the agency service, and that Nadelca was therefore wholly-owned by Ciramar, Ltd.

Finally, the only return-contact information found within the ten-page fax is that located on the Ciramar, Ltd. cover letter. While there are lines

---

[9] A corporation that would use singular pronouns (i.e., "me" and "I") in this context would arguably mislead the client into believing that the drafter of the letter/contract (here, Carolina Cruz, Assistant Sales & Marketing Manager), rather than corporation itself, is responsible for its content. While avoiding the complex issue of corporate liability, we recognize that, for practical concerns, a corporation regularly refers to itself - even when acting unilaterally - in the plural.

provided at the end of the Nadelca invoice for signature by Nadelca's Commercial Department Contract Preparer (Mrs. Minerva Martinez) and Nadelca's President (German Jiminez) for authorization, neither of these signatures was provided.  The logical conclusion, therefore, is that the invoice was prepared and authorized by Ciramar, Ltd. - the entity that sent the documents - and that any discrepancies would have to be addressed via the Ciramar, Ltd. contact.  It was thus reasonable for Panama to conclude that Ciramar Ltd. wholly-owned Nadelca.

### (b) The Website

Second, Panama argues that its belief that Nadelca was wholly-owned by Ciramar Ltd. was justified because "Ciramar['s] own website indicated that Nadelca was part of the 'Ciramar Group.' " Response to Verified Motion for Attorneys' Fees at 10 [D.E. 52]; *see also id.* at 5.  Nadelca did not challenge that contention.  And our own research into the pertinent web archives confirmed Panama's contention.  In both the old and the new Ciramar, Ltd. web sites,[10] the homepage menu bar contains a tab for "Agency Services."  The tab links directly to a web page briefly describing Nadelca's operations.  Ciramar's company logo remains in the header.  At the very bottom of the respective pages, where the web-site creator's publication information is regularly found, the old page indicates that is was produced by

---

[10]    The old site is available at http://web.archive.org/web/20070711232607/http://www.ciramar.com; the new site is available at http://www.ciramar.com.

"Ciramar Group," whereas the new page indicates that it was produced by "Ciramar."

Furthermore, and as Panama has pointed out, the page, old or new, does not contain any language indicating that Nadelca is an independent entity.  *Id.* at 10.  We find that it was entirely reasonable to conclude upon review of the website that Nadelca was an owned subsidiary of Ciramar Ltd.

### (c) The Report

Third, Panama supports its decision to include Nadelca in the suit by pointing out that, prior to filing, it hired a Dominican Republic attorney to research and report on the connection between Nadelca and Ciramar.  That attorney reported to Panama that Nadelca and Ciramar shared a common address and that it was "common knowledge" that Ciramar owned Nadelca. *Id.*  While the attorney on whom Panama relied was ultimately wrong in concluding that Ciramar fully owned Nadelca, the fact that Panama retained foreign counsel to assure (or rather, attempt to assure) that the two entities were connected *before filing suit* belies Nadelca's argument that Panama acted in bad faith in naming it as a defendant.

In short, the record demonstrates that Panama did not act imprudently or recklessly in initiating suit against Nadelca.  Nadelca has failed to show that Panama acted with bad faith, malice, or wanton disregard for Nadelca's rights, and is therefore not entitled to an award of attorneys' fees on this basis.

### C.   *Bad Faith in Delaying Dismissal*

Finally, in its Reply, Nadelca argues that it is entitled to an award of attorneys' fees because Panama unreasonably delayed in dismissing the case, thus causing Nadelca to "spend the resources to defend with its Motion to Dismiss . . . ."  Reply in Support of Verified Motion for Attorneys Fees at 2 [D.E. 53].  Nadelca contends that Panama's failure to immediately dismiss the case after learning that funds sufficient to cover the claimed damages were seized from Ciramar demonstrates bad faith, and thus entitles it to an award of attorneys' fees.  *Id.*  Nadelca stresses that Panama was informed that it had attached excessive amounts on May 6, 2008, but did not dismiss Nadelca until June 6, 2008.  *Id.*

Nadelca's argument, however, is based on the false assumption that Panama's decision to dismiss Nadelca was based solely on information that the seizures were excessively large.  As Panama indicated in its Response, discovery of funds in the name of Ciramar, S.A. came as a surprise because it had originally brought suit against Ciramar, Ltd.  Response to Verified Motion for Attorneys' Fees at 6 [D.E. 52].  Upon learning (on May 6, 2008) that the funds seized belonged to Ciramar, S.A. (rather than Ciramar, Ltd.), Panama *began* an investigation to determine whether the funds of Ciramar, S.A. could be reached via an alter-ego theory.  *Id.*  This required, at a minimum, obtaining counsel in the Dominican Republic, time for that counsel to investigate Ciramar, S.A. in the Dominican Republic, time for Panama's

Counsel to research the feasibility of an alter-ego claim, and - once Nadelca's Motion to Dismiss was filed on May 16, 2008 - time for the Dominican Republic counsel to investigate the claims made in Mr. Jimenez's affidavit.  It is entirely reasonable that Panama would wait until it was confident that it could reach the assets held by Ciramar, S.A. before it decided to dismiss Nadelca - especially in light of the yet-to-be-explained charges for weld and paint.  It is also reasonable to believe that an investigation to confirm that determination would take a month's time.

This Court finds that Panama did not act in bad faith in not filing a dismissal immediately after learning of the excessive Ciramar, S.A. seizures. Panama's one-month response time was reasonable, and Nadelca is therefore not entitled to an award of attorneys' fees as there is no evidence of bad faith or recklessness in this respect.

### III.  CONCLUSION

Based on the foregoing, Nadelca's Verified Motion for Attorneys' Fees [D.E. 50] is hereby **DENIED.**

Again, as stated in *supra* note 1, the Court is disposing of the pending motion by Order for administrative reasons.  But in the event timely objections are made to the Order under Local Magistrate Rule 4(b), the District Judge shall treat those objections as ones seeking *de novo* review and treat this Order as a Report and Recommendation.  The Court notes as well that the failure to timely file objections shall bar the parties from attacking

on appeal factual findings contained herein. *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LaConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND ORDERED** in Chambers at Miami, Florida this 26th day of March, 2009.

EDWIN G. TORRES
United States Magistrate Judge